# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CORINNE ROBERTSON, : 
 : 
     Plaintiff, :   Civil Action No.:   08-1944 (RMU)
 : 
     v. :   Re Document No.:  26
 : 
GENE DODARO, : 
Comptroller General of the United States : 
Government Accountability Office, : 
 : 
     Defendant. : 

## MEMORANDUM OPINION

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the court on the defendant's motion for summary judgment. The *pro se* plaintiff, an African-American woman, brings this action against her employer, the United States Government Accountability Office ("the defendant" or "the GAO"), asserting claims of disparate treatment based on race and gender and a hostile work environment, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* Because the plaintiff has failed to raise a genuine dispute of material fact as to the defendant's legitimate non-discriminatory reason for the adverse employment action at issue, the court grants the defendant's motion for summary judgment as to the plaintiff's disparate treatment claims. Further, because the plaintiff bases her hostile work environment claim on the same factual allegations on which she bases her disparate treatment claims and because those allegations do not support an inference that the defendant's actions were based on race or gender, the court also grants the defendant summary judgment on the plaintiff's hostile work environment claim.

## II. BACKGROUND

### A. Factual Background

### 1. The FAM Update Project

Since 1997, the *pro se* plaintiff, an African-American woman, has worked as a senior analyst with the GAO's Financial Management and Assurance Team. Am. Compl. ¶ 6. In 2001, the plaintiff was assigned to update the GAO's Financial Audit Manual ("FAM"), which describes the methodology used by the federal government to conduct internal audits. Def.'s Mot. at 2; Pl.'s Dep. at 26-27. At that time, and during all times relevant to this lawsuit, the plaintiff was supervised by Roger Stoltz, the assistant director of the FAM project. *See* Def.'s Mot., Sebastian's Dep. at 13. Stoltz's supervisor and the director of the project was Steven Sebastian. Def.'s Mot. Stoltz Dep. at 19-21.

In 2006, the GAO began its substantive work on the FAM. *See* Pl.'s Dep. at 34. The plaintiff and her white female co-worker, Janet Krell, were the only full-time employees assigned to work on the FAM project. Def.'s Mot. at 3. Krell, an assistant director, outranked the plaintiff in both title and salary, as Krell was compensated at the "band III" salary level, while the plaintiff received a salary at the lower "band II-A" level.[1] Stoltz Dep. at 23-24. Notwithstanding these differences in pay and title, Krell, like the plaintiff, reported directly to Stoltz, *see* Stoltz Dep. at 61, and their job responsibilities were indistinguishable, *see* Pl.'s Opp'n, Ex. 3 (Decl. of McCoy Williams, Former Managing Director of the Financial Management and Assurance Team, ("McCoy Decl.")) ¶ 9. Generally, these duties included identifying the changes needed to update the FAM and drafting proposals of the FAM's revised sections. *See* Pl.'s Dep. at 44.

---

[1] The GAO refers to the levels of its employees' salary compensation system as "bands." Def.'s Mot. at 2 n.1. Analysts like the plaintiff are organized into bands I, II-A, II-B and III, depending on their responsibilities. *Id.*

## 2. The Plaintiff's Performance Evaluations

GAO employees are mentored and evaluated by a Designated Performance Manager ("DPM"). Def.'s Mot. at 2 n.2. A DPM is expected to meet periodically with his or her assigned employee to discuss the employee's expectations, provide mid-year feedback about the employee's performance, prepare a yearly final performance evaluation and provide additional feedback concerning that evaluation. *Id.* For those employees compensated at the band II-A level (like the plaintiff), the final performance evaluation calls for ratings in seven competencies, for each of which an employee may be ranked in one of four ways: "below expectations," "meets expectations," "exceeds expectations" or "role model." *Id.* at 3. The DPM's supervisor is required to sign off on the ratings in order to ensure that the DPM applied the criteria for the competencies consistently and accurately. Sebastian Dep. at 27.

Stoltz became the plaintiff's DPM in 2001 and served in that capacity through 2006. Stoltz Dep. at 38, 77. In his 2006 performance evaluation of the plaintiff, Stoltz rated the plaintiff as "meets expectation" in all competencies. *Id.* at 51; Pl.'s Opp'n, Ex. 4. As required, Stoltz's supervisor, Sebastian, approved of the evaluation, after discussing with Stoltz his reasoning for the ratings. Sebastian Dep. at 27-28, 35-36. Shortly thereafter, the plaintiff filed an administrative grievance, contending that she deserved a higher rating because she was had been the "major contributor" to the FAM project and because her job assignments exceeded those that were normally fit for her band level. Def.'s Mot., Ex. G. at 1.

At the plaintiff's request, her 2007 performance evaluation was conducted by Gail Vallieres, another assistant director who was not the plaintiff's supervisor. Def.'s Mot., Ex. J. at 1. Based on information she had gathered from Stoltz and Sebastian, Vallieres Dep. at 17; *see also* Pl.'s Dep. at 93-94, Vallieres evaluated the plaintiff as "meets expectations" in four of the

seven competency areas and "exceeds expectations" in the remaining three competencies. Def.'s Mot., Ex. J at 1. Vallieres relayed to the plaintiff her supervisors' comments and purportedly told the plaintiff that she needed improvement in her behavior and attitude, particularly as it affected her ability to collaborate with others.[2] Pl.'s Dep. at 93; Vallieres Dep. at 20-21, 29-30. More specifically, the plaintiff claims that Vallieres told her that she was viewed as dismissive, superior, condescending and unhappy. Pl.'s Dep. at 93; Vallieres Dep. at 33-34. The plaintiff told Vallieres that she felt her supervisors' comments were sexist and that her supervisors did not want her to succeed. Pl.'s Dep. at 97-98. According to the plaintiff, Vallieres then recommended that the plaintiff read a book "about a woman's role in a man's world." Pl.'s Dep. at 80.

In 2008, the plaintiff and Vallieres had a mid-year feedback session, during which Vallieres allegedly told the plaintiff that she "would not be getting the ratings necessary to be promoted." Def.'s Mot., Ex. Q ("Pl.'s EEO Complaint") at 2. Additionally, the plaintiff claims that Vallieres continued to raise the same "subjective personality issues" and noted that she was not "pleasing [the] director." *Id.*

### 3. Stoltz's Invitation to the Plaintiff to Visit Europe

During the 2006 evaluation period, in addition to serving as the director for the FAM project, Stoltz also served as the assistant director to another audit team. Stoltz Dep. at 82. In this capacity, he supervised and was the DPM for Pat Summers, a white woman who was

---

[2]      In asserting their positions, both parties heavily rely on deposition testimony taken during discovery. *See generally* Def.'s Mot.; Pl.'s Opp'n. Although the court may not consider "sheer hearsay" at the summary judgment stage, *Greer v. Paulson*, 505 F.3d 1306, 1311 (D.C. Cir. 2007), the court may consider second-hand statements that appear to be offered for a purpose other than their truth (such as to show the effect on the hearer) that do not constitute hearsay," *see also Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (noting that at summary judgment the court may consider evidence that is capable of being converted into admissible evidence); FED. R. EVID. 801(c) (defining hearsay).

promoted in 2006 from band II-A to band II-B after Stoltz recommended her for performance awards and gave her a positive evaluation.  *Id*. at 85, 87-88.  Stoltz also supervised Cara Bauer, another white woman who, during the 2006 evaluation period, was a band I analyst.  *Id*. at 83; 85-86.

Stoltz, Summers and Larson were required to travel to Europe in November 2006 as part of their official GAO duties.  Stoltz Dep. at 83.  Prior to their departure, Stoltz invited the plaintiff to take her vacation time and join the group abroad.  *Id*. at 84-85.  As the plaintiff recounts it,

> while preparing for the trip, [Stoltz, Larson, and Summers] would talk about wine lists and sites that they intended to visit, and [Stoltz] looked at me and said 'You should take your vacation and come with us.'  And I said 'Well, will the government be paying for me?'  And he laughed.  And we both sort of laughed.

Pl.'s Dep. at 59.  According to Stoltz, he "had had other staff members in the past show up [in Rome or Paris, for instance] and [they] would go out to dinner, [they] would go see sights on the weekends, and basically off duty assignments."  Stoltz Dep. at 84.

### B.  Procedural History

On July 3, 2008, the plaintiff contacted an EEO counselor and, a few weeks later, filed a formal complaint with the GAO's Equal Employment Opportunity ("EEO") office, alleging that Stoltz and Sebastian had discriminated against her on the basis of race and gender by providing negative ratings in connection with her 2006 and 2007 evaluations as well as her 2008 mid-year feedback session.  Pl.'s EEO Complaint at 2.

In November 2008, the plaintiff commenced this action, alleging that her supervisors discriminated against her on the basis of her race and gender and subjected her to a hostile work environment by providing her with negative performance evaluations.  *See generally* Am. Compl.  The defendant has filed a motion for summary judgment.  *See generally* Def.'s Mot.

With this motion now ripe for adjudication, the court turns to the applicable legal standards and the parties' arguments.

## III. ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

## B. The Court Grants the Defendant's Summary Judgment on the Plaintiff's Disparate Treatment Claims

### 1. Legal Standard for Gender, Age and Race Discrimination

When the defendant in a Title VII or ADEA case presents a legitimate, non-discriminatory reason for its actions,[1] the district court need resolve only one question to adjudicate a motion for summary judgment: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008). The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of

---

[1]    In those rare cases in which the defendant fails to present a legitimate, non-discriminatory reason for its actions, the court must follow a three-part burden-shifting analysis known as the *McDonnell Douglas* framework. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (noting that once the defendant presents a legitimate, non-discriminatory reason "the *McDonnell Douglas* framework . . . disappears, and the sole remaining issue is discrimination *vel non*") (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973)); *see also Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008) (explaining that "the prima facie case is a largely unnecessary sideshow").

discrimination that may be available to the plaintiff.  *Waterhouse v. Dist. of Columbia*, 298 F.3d

989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir.

1998)).  The plaintiff need not present evidence in each of these categories to avoid summary

judgment.  *Aka*, 156 F.3d at 1289.  Rather, the court should assess the plaintiff's challenge to the

employer's explanation in light of the total circumstances of the case.  *Id.* at 1291.

### 2.  The Plaintiff Fails to Rebut the Defendant's Legitimate Non-discriminatory Reason for Her Performance Evaluation Ratings

The defendant contends that the plaintiff's performance ratings were the result of her

supervisors' "careful and considered application of the performance standards" to her work

activities.[3]  Def.'s Mot. at 11.  The defendant has also identified deficiencies in the plaintiff's job

performance, such as her incomplete or substandard work product, Stoltz Dep. 33, 47, 55, her

want of initiative, *id.* at 54-55, her lack of openness to constructive criticism, Vallieres Dep. at

29-30, and her inability to collaborate with others, *id.* at 20-21.

The defendant's dissatisfaction with the plaintiff's performance establishes a legitimate,

non-discriminatory reason for the plaintiff's performance ratings.  *See Paquin v. Fed. Nat'l.*

*Mortg. Ass'n*, 119 F.3d 23, 29 (D.C. Cir. 1997)  (holding that an employer proffered a legitimate

non-discriminatory reason for negative performance evaluation by offering an evaluation that

criticized the employee's work performance and identifying specific examples of the employee's

inadequate performance); *see also Dews-Miller v. Clinton*, 707 F. Supp. 2d 28, 52 (D.D.C. 2010)

(noting that the supervisors' dissatisfaction with employee's work was a legitimate,

nondiscriminatory reason for employee's two "minimally successful" performance evaluations).

---

[3]  The defendant concedes for purposes of its summary judgment motion that the plaintiff suffered
an adverse employment action as a result of her performance appraisals because the "GAO links
performance appraisals to [an employee's] pay."  Def.'s Mot. at 10; *see also Russell v. Principi*,
257 F.3d 815, 818-19 (D.C. Cir. 2001) (holding that a performance evaluation resulting in "loss
of a bonus that is worth hundreds of dollars" is  an adverse employment action).

Accordingly, the court turns to consider whether, in light of the total circumstances of the case, the plaintiff has "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated" against the plaintiff on the basis of her race or gender. *See Brady*, 520 F.3d at 495. The plaintiff contends that discriminatory content can be inferred from the following evidence: (a) the higher performance ratings she received by other supervisors, (b) remarks made by Stoltz and Sebastian, (c) comparisons drawn between herself and other white co-workers and (d) statistical data of a discrepancy between the performance ratings of African-Americans and other GAO analysts. The court considers each piece of evidence below.

### a. The Higher Performance Ratings Given to the Plaintiff by Other Supervisors Do Not Give Rise to an Inference of Discrimination

The plaintiff asserts that the pretextual nature of the defendant's legitimate, non-discriminatory reason is evidenced by the fact that her performance assessment scores "were always lower in the years when she was rated by supervisor Stoltz." Pl.'s Opp'n at 19. The defendant contends that the plaintiff's own "subjective assessment that she should have received higher ratings" provides no evidence of pretext for discrimination. Def.'s Mot. at 14-15.

In assessing whether the defendant's legitimate, non-discriminatory reason for the plaintiff's performance ratings is pretextual, the court is not concerned with whether an employer's performance evaluation was "wise, fair or correct." *Kelly v. Mills*, 677 F. Supp. 2d 206, 228-29 (D.D.C. 2010). Rather, the court's sole function is to determine "whether [the employer] honestly believed" that the plaintiff's work product and performance deserved the given ratings and "acted in good faith upon those beliefs." *Id.*; *see also Manuel v. Potter*, 685 F. Supp. 2d 46, 63 (D.D.C. 2010) (noting that the court does not sit as a "super-personnel department" that "independently reevaluates the quality of an employee's work product"

(internal quotations and citation omitted)).  Thus, a plaintiff aiming to demonstrate that an employer's performance-based explanation is pretext must provide evidence suggesting that the explanation was a lie.  *See Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008) (noting that "it will not do for the plaintiff to show that the employer's stated reason was false if the employer believed it in good faith; the plaintiff must establish a basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory" (citing *Brady*, 520 F.3d at 495)).  Moreover, an employee's subjective assessment of her own performance is insufficient to establish such pretext evidence.  *See Dorns v. Geithner*, 692 F. Supp. 2d 119, 135 (D.D.C. 2010) (granting the defendant summary judgment because "the plaintiff ha[d] produced no evidence beyond her own subjective opinion that she performed at a higher level" than her performance reviews reflected).

Here, the plaintiff argues that the high evaluations she received in her 2008 and 2009 performance evaluations by supervisors other than Stoltz and Sebastian undermine the defendant's performance-based legitimate, non-discriminatory reason and give rise to an inference of discrimination.  *See* Pl.'s Opp'n, Exs. 6-7.  The plaintiff is mistaken.  Although these higher ratings may suggest that Stoltz erred in rating the plaintiff as "meets expectation," nothing about these comparisons suggests that Stoltz's evaluation was the result of discriminatory motives.  *See, e.g.*, *Nurriddin v. Golden*, 382 F. Supp. 2d 79, 101 (D.D.C. 2005) (concluding that evidence of previous positive performance reviews and numerous letters of commendation did not give rise to an inference of discriminatory intent because that "evidence has nothing to do with any possible discrimination by defendant"); *Hussain v. Prinicipi*, 344 F. Supp. 2d 86, 102 n.19 (D.D.C. 2004) (stating that "the fact that a previous manager found that plaintiff had met or exceeded expectations does not, by itself, establish that a subsequent

manager's evaluation of employee's performance was discriminatory" (internal citation omitted)).

The plaintiff has not provided any evidence to suggest that Stoltz did not honestly believe that the plaintiff's performance and work product warranted the "meets expectations" ratings, nor has she attempted to discredit the specific examples he has provided to justify his ratings. *See Manuel*, 685 F. Supp. at 63 (granting summary judgment to the defendant because the plaintiff failed to provide any evidence to undermine his supervisors' claim that they "honestly believed that the plaintiff's work was deficient at the time" he received a negative performance review); *see also Fishbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (observing that in determining whether the plaintiff has put forth sufficient evidence to infer pretext, the critical issue is not whether the employer's reasons were true or false, but whether it honestly believed the reasons when taking the personnel action). Accordingly, evidence of the plaintiff's higher performance ratings by evaluators other than Stoltz and Sebastian is insufficient to give rise to an inference of race or gender discrimination.

### b. The Remarks by the Plaintiff's Supervisors Do Not Give Rise to an Inference of Discrimination

The plaintiff contends that Stoltz and Sebastian's description of her as "dismissive," "superior," "condescending" and "sarcastic," as well as their comments concerning her "tone of voice" and the fact that she was not "smiling enough" or "looked unhappy," all stemmed from their purported belief that female employees should appear "softer." Am. Compl. ¶ 9; Pl.'s Opp'n at 18. The plaintiff argues that these remarks, especially when considered in light of Stoltz's Europe invitation and the book recommended by Vallieres regarding how a woman can succeed in a man's world, constitute sexual stereotyping forbidden under Title VII. Pl.'s Opp'n at 10-11.

The defendant argues that the plaintiff "fails to present any evidence whatsoever linking [these comments] to [the plaintiff's] race or sex," and posits the invitation by Stoltz as well as the comments by Sebastian and Stoltz "could just as easily have been directed at a white male." Def.'s Mot. at 11-13, 21. With regard to Vallieres' book suggestion, the defendant argues that this provides no basis from which to infer discrimination, as the plaintiff herself stated that Vallieres was "absolutely not" racist or sexist. *Id*. at 14 (quoting Pl.'s Dep. at 96).

Comments suggesting that female employees are expected to conform to a certain gender stereotype are evidence of sexual discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (recognizing that a supervisor's remarks made on the basis of a belief that a woman should not act aggressively is evidence of gender discrimination); *see also Nuskey v. Hochberg*, 657 F. Supp. 2d 47, 58 (D.D.C. 2009) (determining that the employer's statements that the plaintiff was an "aggressive woman" and a "strong woman" created a question of material fact as to whether the supervisor was motivated by gender stereotypes in terminating the plaintiff). Moreover, phrases or words that are not facially discriminatory may, depending on multiple factors, "including context, inflection, tone of voice, and local custom," evidence an employer's discriminatory intent. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding that a white manager's use of term "boy" in addressing an African-American employee may give rise to inference of discriminatory animus even absent use of modifiers such as "white" or "black"). It is the plaintiff's burden to provide evidence beyond his or her own subjective assertions of discrimination suggesting that a facially neutral term or phrase was, in fact, discriminatory. *Id.*; *Ezell v. Edwards Theatres, Inc.*, 2006 WL 3782698, at *15-16 (E.D. Cal. Dec. 21, 2006) (determining that a defendant's reference to the African-American plaintiffs' as "you people" constituted evidence of discriminatory intent as the plaintiffs showed that they had previously

complained of being called racial slurs and the defendant had failed to follow its normal procedures to investigate their complaint).

Recognizing the comments by Stoltz and Sebastian's comments describing the plaintiff as "unhappy," "dismissive," "superior," "condescending," and "sarcastic" are, on their face, gender-neutral, *see* Pl.'s Dep. at 94-95, the plaintiff argues that these comments somehow become gender-charged when viewed together with the Stoltz and Sebastian's comment that the plaintiff should "watch her tone." Pl.'s Opp'n at 17-18. The plaintiff, however, fails to explain how such an admonition elevates gender-neutral comments into comments that target the plaintiff out on the basis of her gender. *See Nurriddin*, 382 F. Supp. 2d at 95 (declining to infer discriminatory intent from an employer's reference to the plaintiff's "negative attitude" in a reprimand letter because the employee failed to present any evidence substantiating his contention that "'negative attitude' was a 'code term for 'uppity Negro' who does not know his place'"); *Mann v. Montgomery*, 1994 WL 383905, at *2-3 (N.D. Ill. July 18, 1994) (determining that a supervisors' comments that the plaintiff "bitched" and was pushy were facially gender-neutral comments and were not evidence of pretext because the plaintiff had not provided any evidence to suggest that the comments were gender-charged).

The plaintiff also argues that Vallieres's recommendation that the plaintiff read a book about a woman's role in man's world transformed the supervisors' otherwise gender-neutral comments to gender-charged comments. Pl.'s Opp'n at 18. The record suggests, however, that Vallieres's book recommendation was an independent comment by Vallieres made in response to the plaintiff's expressed concern that her 2007 performance ratings were sexist. Pl.'s Dep. at 80. Moreover, the plaintiff acknowledges that Vallieres herself never discriminated against her. *See id*. at 96 (stating that the plaintiff had "absolutely not" observed anything about Vallieres which

would indicate that she was racist or sexist). Without any evidence to suggest that Stoltz or Sebastian had anything to do with Vallieres's book recommendation or that Vallieres acted discriminatorily, this incident does not elevate the otherwise gender-neutral comments by Stoltz and Sebastian to sexually discriminatory remarks that could serve as evidence of pretext.

Finally, a reasonable juror could not infer discriminatory intent from Stoltz's suggestion that the plaintiff should join him and the audit group he supervised on their trip to Europe. Stoltz's invitation to the plaintiff was not on its face sexually discriminatory. Furthermore, the plaintiff provides no evidence, such as a sexist work atmosphere or a history of sexually harassment by Stoltz or others which would permit a reasonable juror to infer that this gender-neutral invitation constituted sexual discrimination. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513 (D.C. Cir. 1995) (concluding that evidence that an employer had called the plaintiff a "bitch" who was "extremely difficult on secretarial and support staff" was insufficient evidence from which a reasonable juror could infer gender discrimination because "though possibly inappropriately phrased, [the evaluation] was obviously grounded in gender-neutral concerns about [the plaintiff's] interpersonal relations with co-workers, rather than discriminatory considerations"); *cf. Czekalski v. Peters*, 475 F.3d 360, 368 (D.C. Cir. 2007) (vacating summary judgment for the defendant because the plaintiff presented testimony from co-workers indicating that her supervisor harbored gender bias).

In sum, the plaintiff has offered nothing to suggest that the comments by Stoltz and Sebastian constituted anything more than negative feedback from a supervisor concerning her job performance. Without more, these comments simply do not suggest that the plaintiff's supervisors were discriminating against the plaintiff due to her gender.[4]

---

[4] The plaintiff has provided no evidence to support the claim that these comments were racially motivated. *See generally* Pl.'s Opp'n.

### c. The Plaintiff Fails to Draw Comparisons Between Herself and Similarly Situated Co-Workers From Which a Reasonable Juror Could Infer Discriminatory Intent

.

The plaintiff also attacks the defendant's performance-based justification by arguing that she was given poorer ratings for work product that was equal or superior to three similarly situated white females: Janet Krell, Patricia Summers and Cara Bauer. Pl.'s Opp'n at 25-26. Additionally, the plaintiff contends that out of all of the band II-A employees reviewed by Sebastian, the plaintiff "was rated lower than all her non-African American counterparts for the performance year 2006." *Id.* at 8.

The defendant responds that Krell, Summers and Bauer are not similarly situated to the plaintiff because they are on different band levels and are, therefore, evaluated using different performance standards. Def.'s Mot. at 15-18; Def.'s Reply at 6. Further, it argues that even if Krell and the plaintiff were similarly situated to the plaintiff while they were working together in 2006, they both received identical assessment scores for that evaluation period and were therefore not treated differently. Def.'s Reply at 6. Additionally, with regard to the employees who were of the same band and also reviewed by Sebastian, the defendant submits that the data does not support an inference of discrimination because it shows that African Americans also received higher reviews than both the plaintiff and white employees. *Id.* at 5.

Perhaps the most common way that employees attempt to demonstrate pretext is by showing that similarly situated employees of a different race were treated more favorably. *See Brady*, 520 F.3d at 495. Such comparisons, however, will only give rise to an inference of discrimination if "all of the relevant aspects of [their] employment situation [are] 'nearly identical.'" *Neuren*, 43 F.3d at 1514 (D.C. Cir. 1995). With respect to Summers and Bauer, the court notes that these individuals did not work on the same FAM update project as the plaintiff, had different job responsibilities and were compensated at different pay levels than the plaintiff.

*See* Pl.'s Dep. at 128 (stating that Summers was a band II-B employee and did not work on the FAM update); Def.'s Mot., Ex. U (indicating that Bauer was a band I employee and did not report to Stoltz during the relevant time periods); Sebastian Dep. at 17-18 (stating that plaintiff, Krell and Sebastian were the staff assigned to the FAM update). Thus, the court concludes that the plaintiff is not similarly situated to either Summers or Bauer, *cf. McFadden v. Ballard, Spahr, Andrews and Ingersoll, LLP*, 580 F. Supp. 2d 99, 109-110 (D.D.C. 2008) (observing that two individuals are properly compared because they were subject to the same standards and engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them), and a reasonable juror could therefore not infer discrimination from this evidence, *see Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (observing that "[i]n the absence of evidence that the comparators were actually similarly situated" to the plaintiff "an inference of falsity or discrimination is not reasonable" (internal quotations and citation omitted)).

The plaintiff and Krell worked together under the supervision of Stoltz as full-time employees in the FAM project, Stoltz Dep. at 14, and had nearly the same employment duties, Williams Decl., Ex. 3 at ¶ 10. Krell, however, out-ranked the plaintiff in title and compensation, and was therefore evaluated on the performance standards corresponding to her higher band III level. *See* Def.'s Mot., Ex. E at 9 (explaining the performance evaluation criteria corresponding to each band level). Because the pay band level dictates the performance standards by which an employee is measured, Krell and the plaintiff were not similarly situated as they were not "nearly identical" under all of the relevant aspects of their employment. *See Barbour v. Browner*, 181 F.3d 1342, 1345-56 (D.C. Cir. 1999) (concluding that two employees with similar job descriptions but different pay grades were not similarly situated). Thus, a reasonable juror could

not infer discrimination from a comparison of the plaintiff and Krell. *See Montgomery*, 546 F.3d at 707. Moreover, even assuming that the two were similarly situated, there is no indication that Krell, who also received "meets expectations" ratings while working on the FAM project, *see* Def.'s Reply, Ex. at 1, was treated more favorably than the plaintiff, *see Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1555 (D.C. Cir. 1997) (affirming the district court's ruling that there was no basis for inferring discrimination from the salaries received by employees similarly situated to the plaintiff because their salaries were "nearly identical"). Accordingly, the plaintiff fails to draw an inference of discrimination by comparing herself to these co-workers.

The plaintiff's comparisons between her rating averages and those of other band II-A employees in Sebastian's group also fail to suggest that the defendant's legitimate, non-discriminatory reason is pretext for discrimination. In asserting that she "was rated lower than all her non-African American counterparts for the performance year 2006," the plaintiff refers to a GAO data sheet which reports the various rating averages of individuals in the band II-A pay level who were also reviewed by Sebastian in 2006. *See* Def.'s Mot., Ex. U. Although the data sheet shows that the plaintiff, along with an Asian female, received the lowest rating average for the group, it is also clear that three African-American women in the group received rating averages higher than those of the plaintiff. *See id.* Moreover, there is no indication that any of these individuals are similarly situated in their job responsibilities. *See McFadden*, 580 F. Supp. 2d at 109-110. Thus, the plaintiff fails to draw comparisons between herself and similarly situated employees from which a reasonable juror could infer discriminatory intent.

**d. The Ivy Study Alone is Insufficient to Give Rise to an Inference of Discrimination**

In 2005, it came to the GAO's attention that there was a significant difference in the rating averages between African-American and white employees across all salary band levels,

regardless of the employee's length of service. Pl.'s Opp'n, Ex. 9 ("Ivy Report") at 8. After noting that the disparity continued to grow, in 2007, the GAO commissioned an independent third party, the Ivy Planning Group, to examine the factors influencing the disparity that had developed from 2002 through 2006 ("the Ivy Study"). *Id.* at 9. After controlling for variables like education, gender, years of experience, risk level of projects and the demographics of the employee's evaluator, the study confirmed that there was a statistically significant difference between the mean ratings of African-American and white analysts across almost all salary bands and departments. *Id.* at 38. Although the "causes for [the] rating disparities [were] not clear," *id.* at 39, the study suggested that certain aspects of the defendant's workplace culture may have influenced the disparity, *id.* at 48-61.

The plaintiff submits that the Ivy Study "makes an unequivocal finding that attitudes and perceptions of supervisors result in lower ratings being given to African-Americans," and asserts that "it was those very attitudes and misperceptions . . . that Stoltz and Sebastian brought to bear on their evaluation of her in 2006 and 2007." Pl.'s Opp'n at 15-16. Thus, the plaintiff concludes that an inference of racial discrimination may be drawn from findings of the Ivy Study. *Id.*

The defendant counters that the Ivy Study is irrelevant to the plaintiff's claim of disparate treatment because it fails to establish whether the plaintiff was individually the target of a discriminatorily motivated employment action. Def.'s Reply at 9. In addition, the defendant argues that the Ivy Study was inconclusive in determining the cause of the difference between the mean ratings of African-Americans and white employees, and, therefore, does not give rise to an inference of discrimination. *Id.* at 8-9.

In determining whether an employer has unlawfully discriminated against an individual employee on the basis of her race and gender, statistical evidence may be helpful, although it is

ordinarily not dispositive. *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984) (observing that statistical evidence is less significant in the individual disparate treatment context than in disparate impact and class-wide disparate treatment cases); *Cook v. Boorstin*, 763 F.2d 1462, 1468 (D.C. Cir. 1985) (observing that in a disparate treatment case a "plaintiff may employ statistics concerning the employment practices of the defendant to rebut explanatory defenses as pretextual"). Indeed, statistical evidence "alone is insufficient to create an inference of disparate treatment" in individual disparate treatment actions. *Simpson v. Leavitt*, 437 F. Supp. 2d 95, 104 (D.D.C. 2006) (concluding that statistical evidence of discrimination is "not conclusive [in a disparate treatment case] and will instead serve to 'add color'" to a claim of discrimination, presuming other evidence exists to give rise to an inference of discrimination); *see also Horvath v. Thompson*, 329 F. Supp. 2d 1, 10 (D.D.C. 2004) (noting that "statistical evidence is only one small part of a substantial web of evidence indicating pretext" (quoting *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 553 (7th Cir. 2000))). Additionally, a plaintiff seeking to rely on statistical evidence must be similarly situated to those individuals in the statistical group studied, so as to render the analysis relevant. *Aguilar v. Salazar*, 626 F. Supp. 2d 36, 41 (D.D.C. 2009) (determining that a statistical analysis was "fundamentally flawed" and could not be used to support pretext because the individuals studied did not provide a relevant basis of comparison to the plaintiff); *but see Cook*, 763 F.2d at 1469 (observing that it is inaccurate to "suggest that the only permissible way of controlling for occupational classifications was to consider only statistics concerning the plaintiff's particular job"). Finally, the usefulness of statistics "depends on all of the surrounding facts and circumstances," *Horvath*, 329 F. Supp. 2d at 10 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340, (1977)), although the statistical evidence need not account for "every conceivable factor" relevant to an employment decision in order to

sustain an inference of race discrimination, *Davis v. Califano*, 613 F.2d 957, 964 (D.C. Cir. 1979).

After controlling for a variety of variables such as education, experience, job assignment, pay band and demographics of the evaluator, the Ivy Study concluded that there was a statistically significant rating disparity in the 2002 through 2006 performance ratings for African-Americans and white GAO analysts across all different bands. Pl.'s Opp'n, Ex. 9 ("Ivy Report") at 15, 38. Indeed, the disparity between the performance ratings for African-Americans and Caucasians in the band II-A level was found to be statistically significant at a 95% confidence level. Ivy Report at 38, 65, 67. Moreover, the fact that other explanations may exist for the statistical disparity does not render this evidence irrelevant. *Califano*, 613 F.2d at 964. Thus, the Ivy Study's comparison between the performance ratings of African-American and white GAO analysts in band II-A is relevant to plaintiff's claim of race discrimination for her performance reviews in 2006. *Cf. Roberson v. Snow*, 404 F. Supp. 2d 79, 91 (D.D.C. 2005) (holding that statistical evidence did not support finding of pretext because it failed to compare the rates of promotion between similarly situated black and white employees).

Yet, "statistics are not irrefutable," *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1413 (D.C. Cir. 1988), and the Ivy Study does not conclusively determine that discrimination is the cause of the discrepancy between the performance ratings of African Americans and other analysts. *See* Def.'s Reply at 8-9. Because statistical data, like that presented in the Ivy Study, "alone is insufficient to create an inference of disparate treatment," *Simpson*, 437 F. Supp. 2d at 104 (granting summary judgment to the defendant despite the plaintiff's statistical evidence of racial discrimination because there was no other evidence from which a reasonable juror could infer discrimination and the statistical evidence was not enough),

its value lies in "add[ing] color" to any other presented evidence from which a reasonable juror could infer racial discrimination, *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987); *see also Davis v. Ashcroft*, 355 F. Supp. 2d 330, 343 (D.D.C. 2005) (granting summary judgment to the defendant because statistical evidence is "ordinarily not dispositive" in a disparate treatment case where "the ultimate issue is whether the *particular* plaintiff was the victim of an illegitimately motivated employment decision" (citing *Krodel*, 748 F.2d at 709)). In this case, the plaintiff has failed to present any other evidence from which a reasonable juror could infer discrimination. *See supra* Part III.B.2.b-d. Accordingly, the court concludes that, even placing considerable weight on the Ivy Study, the plaintiff's statistical case is insufficient to show pretext and overcome the defendant's legitimate non-discriminatory reason. *Compare Talavera v. Fore*, 648 F. Supp. 2d 118, 134 (D.D.C. 2009) (granting summary judgment to the employer notwithstanding statistical evidence showing a "tendency toward male promotion" because the other evidence proffered by the plaintiff --an ambiguous stray remark by a non-decisionmaker regarding the strong bond between male employees and the destruction of the employer's notes regarding the plaintiff's interview – was insufficient to allow a reasonable juror to infer discriminatory motives); *with Jones v. Mukasey*, 565 F. Supp. 2d 68, 78 (D.D.C. 2008) (denying summary judgment because evidence of a statistically significant deviation between the hiring of African-American and white applicants, in conjunction with other evidence, raised an issue of pretext).

## C. The Court Grants the Defendant's Motion for Summary Judgment as to the Plaintiff's Hostile Work Environment

### 1. Legal Standard for Hostile Work Environment

Title VII prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion,

sex, or national origin. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Toward that end, an

employer may not create or condone a hostile or abusive work environment that is

discriminatory. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Such an

environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Singletary v. District of Columbia*,

351 F.3d 519, 526 (D.C. Cir 2003) (quoting *Meritor*, 477 U.S. at 65, 67). On the other hand,

"[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment – an environment that a reasonable person would find hostile or abusive – is beyond

Title VII's purview." *Harris*, 510 U.S. at 21. Thus, to determine whether a hostile work

environment exists, the court looks to the totality of the circumstances, including the frequency

of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an

employee's work performance. *Id*. at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88

(1998). In considering the totality of the circumstances, however, the court is mindful that

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived)
> disability; and many bosses are harsh, unjust and rude. It is therefore important in
> hostile work environment cases to exclude from consideration personnel decisions
> that lack a linkage of correlation to the claimed ground of discrimination.
> Otherwise, the federal courts will become a court of personnel appeals.

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*,

294 F.3d 365, 377 (2d Cir. 2002)).

### 2. The Court Grants Summary Judgment to the Defendant on the Plaintiff's Hostile Work Environment Claim

The defendant asserts that the plaintiff's hostile work environment claim is based "on the

same set of facts she points to in support of her disparate treatment claim, *i.e.* comments made by

her supervisors regarding her personality." Def.'s Mot. at 20. Thus, according to the defendant,

the plaintiff's hostile work environment claim fails for the same reasons her disparate treatment claim fails: namely, because there is "no evidence that these statements were related to her race or sex." *Id.* The defendant submits that the plaintiff's claims are merely indicative of "a clash of personalities" and contends that the plaintiff experienced "the ordinary tribulations of the workplace" which "simply do not add up to an actionable hostile work environment." *Id.* at 24.

The plaintiff asserts that as a direct result of the defendant's actions she was subjected to a hostile work environment "in which work became emotionally draining, interactions with supervisors became stressful and combative, and efforts were consistently made to demean and belittle the [p]laintiff and deride her work product." Am. Compl. ¶ 10. The plaintiff also contends that the Stoltz ignored parts of her work-related e-mails to him, Pl.'s Opp'n at 21, and stated that he was "watching" her and that no other supervisor wanted to work with her. Am. Compl. ¶ 11.

As an initial matter, the court observes that the plaintiff's hostile work environment claim is based on the same conduct on which she bases her disparate treatment claims. *See* Pl.'s Am. Compl. ¶ 10; Pl.'s Opp'n at 20-21. The plaintiff cannot, however, simply bootstrap her claims of disparate treatment in an effort to create a hostile work environment claim. *Nurriddin*, 382 F. Supp. 2d at 108 (D.D.C. 2005) (concluding that a plaintiff cannot "easily bootstrap discrimination claims into a hostile work environment claim"); *see also Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) (recognizing that discrete acts of discrimination "are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult"). "[A]llowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim . . . would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of

harm each cause of action was designed to address." *Parker v. Del. Dep't of Pub*. Safety, 11 F. Supp. 2d 467, 475 (D. Del. 1998).

Moreover, nothing in the plaintiff's hostile work environment claim suggests that the defendant's comments or actions had any connection to her gender or race, *see generally* Pl.'s Opp'n; Am. Compl.; *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (affirming summary judgment for the defendant on the plaintiff's hostile work environment claim because none of the employer's comments or actions focused on the plaintiff's race, religion, age or disability), or that they were accompanied by physical threats, abusive or offensive language or any other characteristics of "extreme conduct." *See Lester*, 290 F. Supp. 2d at 31 (noting that the plaintiff's allegations must reflect "extreme conduct … to transform 'the ordinary tribulations of the workplace' into a legally cognizable hostile work environment claim" (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998))).

Additionally, the evidence does not indicate that the plaintiff's workplace conflicts, however unpleasant, were so severe or pervasive as to have altered the conditions of her employment. *Harris*, 510 U.S. at 21 (observing that to succeed on a hostile work environment claim a plaintiff must show that his employer subjected him to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"); *Baloch*, 550 F.3d at 1201 (noting that "[t]o determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance"); *see also* Faragher, 524 U.S. at 788  (observing that "simple teasing' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and

conditions of employment'").  Indeed, the plaintiff notes that "her productivity did not decline during the period in question."  Pl.'s Opp'n at 21.

Accordingly, the court grants the defendant's motion with regard to plaintiff's hostile work environment claim.


## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 7th day of March, 2011.

RICARDO M. URBINA
United States District Judge
